IN RE JPB

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-026-CV

IN THE INTEREST OF J.P.B., A CHILD 

------------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

This is a termination of parental rights appeal.  Following a jury trial in November 2003, the trial court terminated the parental rights of Appellants Lonnie B. and Esmeralda B. in their twenty-month old son, J.P.B.
(footnote: 2)  In three issues, Esmeralda argues: 1) the evidence is legally and factually insufficient to support termination of her parental rights; 2) the trial court improperly admitted x-ray prints into evidence; and 3) she was denied effective assistance of counsel at trial.  In one issue, Lonnie contends that the evidence is legally and factually insufficient to show that he knowingly placed J.P.B. in an environment which endangered the child’s physical or emotional well-being, or knowingly allowed J.P.B to remain in such an environment.  He also argues that termination of his parental rights is not in the best interest of J.P.B.  We affirm the trial court’s judgment terminating the parental rights of Esmeralda B.  We reverse that portion of the trial court’s judgment terminating the parental rights of Lonnie B., and render judgment that the Texas Department of Protective and Regulatory Services (TDPRS)
(footnote: 3) take nothing on its claim seeking to terminate the parental rights of Lonnie B. to his son J.P.B.

Background

Lonnie and Esmeralda are married.  Lonnie is J.P.B.‘s father and Esmeralda is J.P.B.’s mother.  After a difficult and complicated pregnancy, J.P.B. was born on April 25, 2002, seven weeks prematurely by caesarean section.  J.P.B. remained in the hospital until he was released to his parents on May 21, 2002.  Esmeralda stayed home to care for J.P.B. while Lonnie worked Monday through Friday from 11:30 a.m. until approximately 8:30 p.m. and every other Saturday.  Esmeralda cared for J.P.B. the majority of the time without help from anyone besides Lonnie, even though she had a difficult time recovering from her caesarean section.

On May 23, 2002, Lonnie took J.P.B. to PediPlace for his first check-up.
(footnote: 4)  Dr. Fitzgerald and the nurses examined the infant but did not express any serious concerns regarding the child’s health.  Eight days later, because J.P.B. cried continuously, Lonnie took J.P.B. back for another check-up.  He was examined again by Dr. Fitzgerald, who said the infant had thrush
(footnote: 5) and prescribed an antibiotic for treatment.  In mid-June Lonnie took J.P.B. to Cook Children’s Medical Center where Dr. Torres examined the child; no health concerns or abnormalities were identified.  Then on June 28, Lonnie took J.P.B. back to PediPlace to receive his routine immunization shots.  Lonnie told the doctor that he was concerned about J.P.B. because he would cry and become fussy after eating.  The doctor examined J.P.B. at that time and did not make any other diagnosis besides thrush.  On July 1, 2002, Lonnie took J.P.B. to Trinity Medical Center (Trinity) because J.P.B. continued to cry and was constipated, and Lonnie was concerned because he noticed the child’s leg was swollen.  X-rays were taken at that time, but J.P.B. was only treated for colic, and Lonnie and J.P.B. were sent home.  Thereafter, on July 7, 2002, Lonnie took J.P.B. back to Trinity because the child continued to be irritable and fussy, and his leg continued to swell.  J.P.B. was admitted into the hospital and remained there until July 12, 2002.  Dr. Farah Naz was J.P.B.’s treating physician at Trinity; her initial diagnosis of the swelling was a secondary infection.  A bone scan and ultrasound were performed during J.P.B.’s stay at Trinity; the results of both tests were normal; however, Dr. Naz did testify that the ultrasound showed inflammation in the muscle.  During J.P.B.’s stay at Trinity, he was examined by other doctors, and various diagnoses were made and treatments recommended.  At no time during the child’s hospital stay did any of the physicians or staff suggest to Lonnie that J.P.B. might have been abused.

On July 12, 2002, J.P.B. was transferred to Children’s Medical Center (Children’s) to have an MRI.  Children’s performed a spinal tap instead of an MRI.  The child was discharged on July 15, 2002 with a diagnosis of myositis (muscle inflammation).  After J.P.B.’s release from Children’s, Lonnie immediately scheduled another appointment with Dr. Naz.  Finally, on July 19, 2002, a skeletal survey was taken of J.P.B.  It revealed multiple fractures ranging from seven days to four weeks old.  After Lonnie was informed about his son’s fractures, the child was removed from his and his wife’s care.

Procedural History

On July 22, 2002, TDPRS filed a petition for the termination of the parent-child relationship between J.P.B. and Lonnie and Esmeralda.  Following a jury trial, the trial judge terminated Lonnie and Esmeralda’s parental rights.

Burden of Proof in Termination Proceedings

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982).  “While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”  
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).

In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.  
Tex. Fam. Code Ann.
 § 161.206(b) (Vernon Supp. 2004-05); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick,
 685 S.W.2d at 20-21;
 In re D.T.
, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  
Tex. Fam. Code Ann. 
§§ 161.001, 161.206(a); 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  
G.M.
, 596 S.W.2d at 847; 
D.T.
, 34 S.W.3d at 630.  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”
  Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).

Standard of Review

The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review.  
In re J.F.C.
, 96 S.W.3d 256, 265 (Tex. 2002).  The traditional no-evidence standard does not adequately protect the parents’ constitutional interests.  
Id. 
 In reviewing the evidence for legal sufficiency in parental termination cases, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
. at 265-66.  We must review all the evidence in the light most favorable to the finding and judgment.  
Id.
 at 266.  This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so.  
Id.
  We must also disregard all evidence that a reasonable factfinder could have disbelieved.  
Id.
  We must consider, however, undisputed evidence even if it does not support the finding.  
Id.
  If we determine that no reasonable factfinder could form a firm belief or conviction that the grounds for termination were proven, then the evidence is legally insufficient, and we must render judgment for the parent.  
Id.

The higher burden of proof in termination cases also alters the appellate standard of factual sufficiency review.  
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002).  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
Id
.  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
.  Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parents violated one of the conduct provisions of section 161.001(1) and that the termination of the parents’ parental rights would be in the best interest of the child.  
Id
. at 28.

Because the facts are different for each Appellant, we will address their issues separately.

Esmeralda’s Issues on Appeal

Esmeralda argues in three issues that: 1) the evidence is legally and factually insufficient to support the verdict in this case; 2) the trial court abused its discretion when it improperly admitted x-rays into evidence; and 3) she was denied effective assistance of counsel at trial.

In a jury trial, a legal sufficiency issue must be preserved through one of the following procedural steps in the trial court: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial.  
T.O. Stanley Boot Co. v. Bank of El Paso,
 847 S.W.2d 218, 220-21 (Tex. 1992);
 
Salinas v. Fort Worth Cab & Baggage Co.
, 725 S.W.2d 701, 704 (Tex. 1987); 
see generally
  William Powers, Jr. & Jack Ratliff, 
Another Look at "No Evidence" and "Insufficient Evidence,"
 69
 Tex. L. Rev
. 515, 530 (1991).  A review of the record reveals that Esmeralda did not preserve her legal sufficiency issue for appellate review; therefore, it is waived.

In her second issue, Esmeralda argues that TDPRS failed to lay the proper predicate for the x-rays introduced at trial through Dr. Eugene Sheffield.  She also argues that the trial court abused its discretion when it admitted the x-rays into evidence over her objection and denied her motion for mistrial.

“The admissibility of evidence is within the discretion of the trial court and will not be overturned absent an abuse of discretion.”  
Moses v. State
, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).  The appellate court should affirm the trial court as long as the ruling is within the zone of reasonable disagreement.  
Id
. The Texas Supreme Court has held that hospital records showing the results of a test are admissible under the Business Records Act, and that any gaps in the chain of custody go to the weight to be given to the testimony, rather than to its admissibility.  
Missouri-Kansas-Texas R.R. Co. v. May
, 600 S.W.2d 755, 756 (Tex. 1980).

In the instant case, the x-rays in question were taken at Children’s, which now uses film-less images that are viewed on computer monitors.  Dr. Sheffield testified that he is a specialist at Children’s in the area of interpretation of pediatric imaging studies.  He also testified that he was the radiologist who evaluated J.P.B.’s images and that they were done properly.  He testified that the images taken had J.P.B.’s name on them, the date on the images was July 7, 2002, the positioning was appropriate, and that the technique was adequate for diagnosis.  Esmeralda’s counsel took Dr. Sheffield on voir dire during the trial, at which time he revealed that he was not present when the images were taken, had never operated the equipment it was taken with, did not know who had taken the image, and had never personally seen J.P.B.  The trial court admitted the x-rays over Esmeralda’s objection.

Furthermore, the next day, out of the presence of the jury, Esmeralda made a motion for mistrial and a motion to strike the admitted x-rays because no proper predicate had been laid.  After additional examination of Dr. Sheffield regarding the procedure used in taking a patient from the emergency room to radiology to obtain an x-ray, the trial court denied the motion for mistrial and motion to strike.  Dr. Sheffield did not personally take the x-rays, could not testify as to who did take them, and did not personally examine J.P.B.  However, based on his experience and expertise in this area, Dr. Sheffield was able to testify about the images contained in the x-rays.  We hold that any gaps in the chain of custody go to the weight of the evidence and not its admissibility.  
See May
, 600 S.W.2d at 756.  We overrule Esmeralda’s second issue.

In her third issue, Esmeralda complains that the trial court caused her to suffer involuntary ineffective assistance of counsel by appointing counsel less than thirty days before trial.  Esmeralda and Lonnie hired a criminal law attorney three days after the removal of J.P.B.  Later, upon that attorney’s recommendation, they hired a family law attorney.  On May 23, 2003, a motion for substitution of counsel was filed by Lonnie and Esmeralda, and the trial court approved the substitution of the new attorney.  On June 10, 2003, Lonnie and Esmeralda filed a motion for continuance.  On August 8, 2003, the attorney filed a motion for withdrawal of counsel as to Esmeralda only, and she consented to the motion.  On October 22, 2003, the court found Esmeralda indigent and appointed her counsel.  On October 30, 2003, Esmeralda’s appointed counsel filed a motion for continuance; however, the record contains no testimony from that hearing.  On November 17, 2003, at the pretrial hearing immediately preceding the trial on the merits, Esmeralda’s counsel announced not ready, stating that his earlier request for a continuance had been denied and that he had not been given an adequate amount of time to prepare.

There is a right to effective assistance of counsel in termination cases.  
In re M.S.
, 115 S.W.3d 534, 544 (Tex. 2003).  We review ineffective assistance of counsel claims under the 
Strickland
 two-pronged test.  
Strickland v. Washington
, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984);  
Thompson v. State
, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).  First, Esmeralda must show that her counsel's performance was deficient; second, she must show the deficient performance prejudiced the defense.  
Strickland
, 466 U.S. at 687, 104 S. Ct. at 2064. 

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case.  
Thompson
, 9 S.W.3d at 813.  The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.  
See Strickland
, 466 U.S. at 688-89, 104 S. Ct. at 2065.  “[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.”  
Id.
 at 690, 104 S. Ct. at 2066.  An allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.  
Thompson
, 9 S.W.3d at 813.  Our scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight.  
Strickland
, 466 U.S. at 689, 104 S. Ct. at 2065.

In her brief argument, Esmeralda contends that the first prong of 
Strickland
 is met.  Because of the short notice to her counsel, she claims that  he was unable to conduct binding discovery, or his own independent investigation into the medical issues involved, or obtain approval for payment for a defense expert to rebut the government’s expert.  Esmeralda does not complain of the trial court’s denial of her counsel’s motion for continuance.  We disagree that the first prong of 
Strickland 
has been met.

There is nothing in the record to show what counsel would have discovered or to what a defense expert would have testified that would have aided in Esmeralda’s defense.  
See Passmore v. State
, 617 S.W.2d 682, 685 (Tex. Crim. App. [Panel Op.] 1981), 
overruled on other grounds by Reed v. State
, 744 S.W.2d 112, 115 (Tex. Crim. App. 1988).  Moreover, the record in this case is replete with evidence of counsel’s effective representation.  The record clearly demonstrates that counsel filed pretrial motions, actively participated in the voir dire of venire members, made an opening statement, objected to testimony and cross-examined witnesses, proposed a jury charge, and gave a closing argument.  Accordingly, there is no evidence to establish Esmeralda’s claim that the trial court caused her to suffer involuntary ineffective assistance of counsel by appointing her most recent counsel twenty-six days before trial.  Esmeralda’s third issue is overruled.

Grounds for Termination of Esmeralda’s Parental Rights

The jury found that Esmeralda violated two provisions of the family code dealing with endangerment of a child.  
See 
Tex. Fam. Code Ann
. § 161.001(1)(D), (E).  Esmeralda challenges the legal and factual sufficiency of the evidence to support both these grounds for the termination of her parental rights.

Jury Trial

As previously noted, this case was tried to a jury rather than to the bench.  Esmeralda argues that there is insufficient evidence to support the jury’s finding that she engaged in conduct that endangered the physical or emotional well-being of J.P.B.  Rule 324(b) requires that a complaint of factual insufficiency of the evidence to support a jury finding be raised in a motion for new trial.  
Tex. R. Civ. P
. 324(b); 
Cecil v. Smith
, 804 S.W.2d 509, 510 (Tex. 1991).  Generally, because no motion for new trial was filed, the error would be waived.  However, a recent Texas Supreme Court decision addressed appellate review of factual sufficiency claims through “the due process prism.”  
M.S.
, 115 S.W.3d at 547.  In
 M.S
., the Supreme Court did not expressly hold that the procedural rule of filing a motion for new trial should be set aside, but did suggest that balancing of the “
Eldridge
 factors
(footnote: 6) could require a court of appeals to review an unpreserved complaint of error to ensure that our procedures comport with due process.” 
Id
. at 546.  In light of this recent case, we will address Esmeralda’s complaint of factual insufficiency.

Texas Family Code Section 161.001(1)(E)

Under section 161.001(1)(E) of the Texas Family Code, Esmeralda’s  parental rights may be terminated if the trial court found by clear and convincing evidence that she “engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.”  
Tex. Fam. Code Ann. 
§ 161.001(1)(E).  Under this section, the term "endanger" means to expose to loss or injury; to jeopardize.  
In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996).  There must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct.  
In re R.D.
, 955 S.W.2d 364, 367-68 (Tex. App.—San Antonio 1997, pet. denied).  Subsection (E) requires a "course of conduct."  
Id.
  Accordingly, when analyzing a jury’s findings pursuant to subsection (E), we must determine whether sufficient evidence exists that the endangerment of the child’s physical well-being was the direct result of the parent’s conduct, including acts, omissions, or failures to act.  
In re D.M.
, 58 S.W.3d 801, 811-12 (Tex. App.—Fort Worth 2001, no pet.).  Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
Tex. Fam. Code Ann
. § 161.001(1)(E); 
D.T
., 34 S.W.3d at 634; 
In re K.M.M.
, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.).

The record supports the conclusion that J.P.B. suffered multiple fractures.  Dr. Thomas Abramo, who treated J.P.B. on July 19, 2002, testified that the child suffered fractures to his ribs, arms, and legs, and that these fractures were at various stages of healing.  Dr. Abramo stated that J.P.B.’s leg fractures were likely caused by yanking the child’s leg, or picking the child up by the thigh or femur, or the child being flung and thrown against something.  Dr. Abramo testified about two possible theories as to how J.P.B.’s rib fractures occurred.  He stated that they were either caused by a direct fist blow, or by grabbing the child around the chest and squeezing inward.  Dr. Abramo explained  that premature babies, such as J.P.B., are at a higher risk for child abuse because they require more care, and it was his opinion that J.P.B. had been battered on multiple occasions.  The State points to Dr. Mark Foster’s psychological evaluation regarding Esmeralda’s ability to care for J.P.B.  His report contained the following:

[Mother]’s responses are like those of individuals who are described as immature, narcissistic, and self-indulgent.  She tends to make excessive demands on others for attention and sympathy. However, she is probably resentful when even the most mild demands are made on her by others. She is likely to have difficulty getting along with others in social situations. [Mother] is probably suspicious of others and is [sic] probably results in her having difficulty establishing  deep emotional ties with others.

[Mother] may have difficulty maintaining employment. Her romantic relationships are probably characterized as having frequent conflicts. [Mother] is likely to have difficulty managing her emotions particularly anger. Others may describe her as irritable, sullen, and argumentative. Conflict with authority figures is common among persons responding in the manner to [Mother] did [sic]. Her anger toward authority figures may be expressed in open criticism.

[Mother] tends to deny serious psychological problems. She may rationalize her behavior and transfer blame for her actions on to others. She will probably have a good deal of difficulty in accepting responsibility for her own behavior. She [sic] probably unrealistic and grandiose in her self-appraisal. Because of her tendency to deny serious emotional problems [Mother] is unlikely to be receptive to traditional counseling or psychotherapy.

Dr. Foster testified that Esmeralda’s most overriding personality trait was lack of maturity and a high level of self-centeredness.  He said that she would be unlikely to face her problems and that she has a strong tendency towards narcissism.  Specifically, Dr. Foster explained that one who is narcissistic has a level beyond what is considered normal of self-focus or self-centeredness.   He stated that narcissistic people have a difficult time taking responsibility for their choices and actions.  Regarding J.P.B., Dr. Foster testified that Esmeralda’s anger may come from having an unrealistic expectation and becoming irritated more easily.  Because J.P.B. was extremely fussy, and cried continuously, Dr. Foster testified that he would be very concerned about Esmeralda’s ability to not let anger affect her relationship with J.P.B.  Furthermore, he stated that her tendency towards narcissism would affect her ability to be an effective and good parent because it would affect her ability to anticipate and be sensitive to the needs of J.P.B.

Dr. Sheffield, a pediatric radiology specialist at Children’s, also testified that J.P.B. suffered numerous fractures.  He stated that J.P.B. had sustained approximately twenty-one fractures to his ribs, arms, and legs.  Furthermore, he testified that all of these fractures were at various stages of healing and highly specified for a battered child.  Dr. Sheffield testified that he had no doubt that J.P.B. had been physically abused.

Esmeralda testified that she was the primary caretaker of J.P.B. and that  there was never anyone else left alone with him.  In fact, she repeatedly testified that she and her husband were the only two people who had continuous access to J.P.B.  She acknowledged that Lonnie was rarely alone with J.P.B. because she did not drive and whenever she left the house, Lonnie would drive.  She stated that J.P.B. constantly cried the first six weeks he was home, but that it never crossed her mind to make a doctor’s appointment to determine if something was wrong with the child.

Esmeralda testified that she believed different medical staff at various times were responsible for J.P.B.’s injuries.  Specifically, she stated that doctors at Children’s or Trinity were responsible because when the doctors would examine the child they would pick him up, pull his leg, or pull his arm to see what was wrong with him.  During the trial, she maintained this theory despite her testimony that she and her husband spent every night at the hospital during J.P.B.’s stay and that she never saw any of the medical staff mistreat the child.  However, when Dr. Sheffield testified, he excluded the possibility of J.P.B.’s injuries occurring in the way Esmeralda described.  In fact, he testified that it would take a significant amount of force to injure a child in this manner.

In summary, the evidence is undisputed that Esmeralda was J.P.B.’s primary caretaker, and she admitted that except for medical professionals, no one else was ever alone with him.  Lonnie, not Esmeralda, initiated the visits to the doctors or hospitals.  Esmeralda contended that J.P.B.’s twenty-one bone fractures were actually caused by the doctors and nurses who examined J.P.B.  However, Dr. Sheffield testified that there was no possible way J.P.B.’s injuries could have been caused by a medical exam—much more force would have been required to cause bone fractures.  J.P.B. was born seven weeks early and Dr. Abramo testified that premature babies are at a higher risk for child abuse because they require more care.  Applying the appropriate standards of review, we hold that the evidence is such that the jury could reasonably form a firm belief or conviction that Esmeralda knowingly engaged in conduct which endangered J.P.B.’s physical or emotional well-being.  Consequently, we hold that there is legally and factually sufficient evidence to support termination of Esmeralda’s parental rights based upon that ground.  If multiple conduct grounds are alleged for termination, the evidence is sufficient if it supports just one of the alleged conduct grounds.  
In re W.J.H.
, 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied).  Therefore, we are not required to address whether the evidence is sufficient to establish termination under section 161.001(1)(D).  We overrule Esmeralda’s first issue.

Best Interests

Additionally, she argues that termination of her parental rights would not be in the best interest of J.P.B.  In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Id.
  161.001; 
Richardson v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.-Waco 2002, pet. denied).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep't of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

Our inquiry here is limited to whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent's parental rights would be in the best interest of the child.  
In re C.H.
, 89 S.W.3d 17, 28 (Tex. 2002).

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C. H
., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  
Id. 
 On the other hand, the presence of scant evidence relevant to each 
Holley
 factor will not support such a finding.  
Id
.

A review of the record in this case supports that there was sufficient evidence to support the jury’s findings that termination of Esmeralda’s parental rights was in the best interest of J.P.B.  For example, Esmeralda cared for J.P.B. a majority of the time and the jury could have reasonably found that it was during this time that J.P.B. suffered twenty-one bone fractures.   Furthermore, since he has been removed from her care, he has received no additional fractures.  Additionally, evidence was presented by two doctors who testified that they were concerned about Esmeralda’s ability to parent J.P.B.   There was testimony about Esmeralda’s medical condition.  She has had several illnesses and is frequently sick. The evidence showed that this affected the stability of the home for J.P.B.  Finally, Esmeralda testified  that she did not cause the injuries to her child and neither did Lonnie.  She agreed that J.P.B. could not have caused the injuries himself and that she did not think J.P.B.’s grandparents were responsible. In her testimony she stated that she believed that medical staff caused these injuries, despite her own testimony that she never saw medical personnel mistreat her child, and the fact that when he was receiving medical treatment, the child was usually with her or Lonnie.  She offers no additional explanation for how J.P.B. suffered these injuries.  In fact, Dr. Abramo testified that in his experience with abusive parents and children of this age, the parents often say it was an accident or they do not know how it happened or do not recall how it happened.  There was evidence introduced to support that Esmeralda attended the psychiatric evaluation with Dr. Foster, attended weekly counseling sessions, and completed parenting class.   However, when Dr. Foster followed up on Esmeralda, he noted that she had made very little progress in therapy.

The only evidence as to Esmeralda’s plan for the future with J.P.B. was that she was willing to make changes.  J.P.B.’s grandmother and grandfather both testified that they wanted custody of their grandson.  J.P.B.’s grandmother testified that she would have concerns for J.P.B.’s safety in his parents care.  She stated that if Lonnie and Esmeralda’s parental rights were terminated she would raise J.P.B. as their son, read to him, teach him, and eventually send him to college.  Furthermore, she testified that she would continue to love and bond with J.P.B.  After a review of the entire record, we hold that the evidence is factually sufficient to support the jury’s findings that termination of Esmeralda’s rights were in the best interest of J.P.B.

Lonnie’s Issue on Appeal

Lonnie contends that the evidence is legally and factually insufficient to support the verdict terminating his parental rights.
(footnote: 7)  He argues that no evidence exists to demonstrate that he knowingly allowed J.P.B to be in places or with persons that could endanger his son’s physical or emotional well-being.

Grounds for Termination of Lonnie’s Parental Rights

We review the evidence supporting the jury’s finding that Lonnie knowingly placed J.P.B. or knowingly allowed him to remain in conditions or surroundings which endangered his physical or emotional well-being.  
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D).
(footnote: 8)
 Reviewing all the evidence in the light most favorable to the jury’s answer, we find no evidence that Lonnie knowingly placed J.P.B in an unsafe environment, or that Lonnie knowingly left J.P.B. in an unsafe environment.   The record establishes that Lonnie made numerous visits to doctors and hospitals because he was concerned for his son’s well-being.  Dr. Naz even testified that Lonnie was a good, caring, and considerate father.  The record reveals that after seven visits to the doctors and/or hospital, Lonnie was given various diagnoses, none of which included possible child abuse.  Finally, on July 19, 2002, on the eighth visit seeking medical assistance, Lonnie was informed that J.P.B. had been physically abused.  Nothing in the record supports a conclusion that Lonnie knew of this abuse prior to July 19, 2002.  Lonnie sought medical help for J.P.B. on eight separate occasions because he was concerned for his child’s well-being.  Lonnie argues that numerous medical professionals came into contact with and examined his son and did not detect any serious medical concerns until J.P.B.’s eighth visit, and that the doctors continued to reassure him that his child was fine.  Lonnie testified that he does not have any medical training [5:140] and that he only completed the tenth grade.  He argues that he is unaware how he would be expected to know what was wrong with his child, given that medical personnel could not and did not detect any physical problems with the child until his eighth visit.

We agree.  Lonnie was rarely alone with J.P.B., and from May 23, 2002 until July 19, 2002, approximately eight times, Lonnie took J.P.B. to visit doctors or to undergo hospital exams in a persistent effort to determine the cause of J.P.B.’s irritable behavior and the swelling of his leg.  Lonnie was present at all of J.P.B.’s examinations, and Dr. Naz testified that he appeared to be caring, attentive, and concerned.  Lonnie has absolutely no medical training, and in fact, none of the physicians or nurses who examined or tested J.P.B. were able to reach any diagnosis of abuse during the first seven visits.  Furthermore, there was no evidence that Lonnie had any knowledge or suspicion that his wife was abusing their son.  Under the circumstances, we hold that there is no evidence from which a factfinder could reasonably form a firm belief or conviction that Lonnie knowingly placed J.P.B. or knowingly allowed J.P.B. to remain in conditions or surroundings which endangered his physical or emotional well-being.  Accordingly, we conclude that Lonnie’s parental rights could not be properly terminated based upon section 161.001(1)(D) because there is no evidence to support the jury’s answer on these grounds.  We sustain Lonnie’s sole issue.

Conclusion

We reverse the trial court’s judgment terminating the parental rights of Lonnie B. and we render judgment that the Texas Department of Protective and Regulatory Services take nothing on its claim seeking to terminate the parental rights of Lonnie B. to his son J.P.B.  We affirm the remainder of the trial court’s judgment.
(footnote: 9)
 PER CURIAM

PANEL B:  HOLMAN, WALKER, and MCCOY, JJ.

DELIVERED:  February 10, 2005

FOOTNOTES
1:
See
 
Tex. R. App. P
. 47.4.

2:
To protect the privacy of the parties involved in this appeal, we identify the child by initials only and Appellants by first names only.  
See
 
Tex. Fam. Code Ann. 
§ 109.002(d) (Vernon 2002). 

3:
Effective February 1, 2004, the name of the agency changed to the Texas Department of Family and Protective Services.  However, for the sake of consistency in this case, we will continue to use TDPRS when we refer to the agency.

4:
It is unclear from the record whether Esmeralda was present at every doctor’s or hospital visit.  Her testimony at trial reflects that she is unsure of specific dates J.P.B. was taken for medical treatment.  Additionally, Lonnie’s testimony mentions his wife being present for some of the visits to the doctors, but regarding other trips to the doctors, there is no mention of Esmeralda’s presence.

5:
A contagious disease caused by a fungus, Candida albicans, that occurs most often in infants and children, characterized by small whitish eruptions on the mouth, throat, and tongue, and usually accompanied by fever, colic, and diarrhea.
  
The American Heritage Dictionary of the English Language 
(4th ed. 2000), 
available at 
http://dictionary.reference.com/search?q=thrush.

6:
The 
Eldridge
 due process analysis consist of three factors: 1) the private interest at stake; 2) the government’s interest in the proceeding; and 3) the risk of erroneous deprivation of parental rights.  Then the net result is balanced against the presumption that our procedural rule comports with constitutional due process requirements.  
Matthews v. Eldridge
, 424 U.S. 319, 335 (1976);
 M.S.
, 115 S.W.3d at 547.

7:
Lonnie preserved his legal sufficiency issue by making a motion for instructed verdict; he preserved his factual sufficiency issue by filing a motion for new trial.

8:
The jury charge also included a question asking the jury whether it found that Lonnie B. engaged in conduct, or knowingly placed J.P.B. with persons who engaged in conduct, which endangered the child’s physical or emotional well-being.  The jury answered the question in Lonnie’s favor.

9:
Lonnie B. does not challenge that portion of the trial court’s judgment appointing Lonnie B. Sr., and Karen B. as permanent managing conservators of J.P.B.